# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00089-CV

---

**A. P., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 21DFAM326003, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A.P. (Mother) appeals from the trial court's decree of termination, following a jury trial, terminating her parental rights to her children, three-year-old Anna and one-year-old Laura.[1] In nine issues, Mother contends that the trial court violated her due process rights; erred when it allowed an undisclosed witness to testify, consolidated Anna's and Laura's cases, and gave certain instructions to the jury; that the evidence was legally and factually insufficient to support the jury's endangerment and best-interest findings; that the trial court abused its discretion in denying her motion for new trial; and that the trial court did not have jurisdiction or its jurisdiction was automatically terminated. For the following reasons, we affirm the trial court's decree of termination.

---

[1] For the children's privacy, we refer to them by pseudonyms, we refer to appellant by her initials or Mother, and we refer to the children's approximate ages at the time of trial. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. The parental rights of the children's father also were terminated in the decree, but he has not appealed. We refer to him as Father.

# BACKGROUND

In July 2021, the Department of Family and Protective Services received a report of Mother's neglectful supervision of Anna based on a shooting incident involving Mother, Father, and Anna that occurred in Alabama in May of that year. With Anna present, Mother was shot in the leg. During her hospital stay for treatment of the gunshot wound, Mother admitted that she had used marijuana; tested positive for benzodiazepines, amphetamines, and marijuana; and left the hospital against medical advice. When Mother later returned to the hospital, her leg was amputated because it had become infected. Anna stayed with Father during the several weeks that Mother was in the hospital. Mother initially reported that she accidentally shot herself or that Anna accidentally shot her when she was taking the gun from Anna, but after she was released from the hospital, she reported that Father shot her while he was holding Anna. Mother stayed with Father and Anna before traveling with Anna to Texas in June. Prior to the shooting incident, Mother had been traveling back and forth between Alabama and Texas because she was on parole in Texas.

When the Department investigator made contact with Mother in July, Mother stated that she was living with her mother (Grandmother); that Grandmother had kicked Mother out for a few days because Grandmother was mad and had done that before; that Mother was in Texas to get away from Father who had shot her in the leg; that she was four months pregnant; and that Father was the father of the unborn child. Mother declined the Department's request to drug test and reported that she was moving to Ohio in two weeks.

Based on its investigation, the Department sought and obtained removal of Anna from Mother and Father and filed a petition to terminate their parental rights. The trial court appointed the Department as Anna's temporary managing conservator, and Anna was placed in

2

foster care. Following a placement hearing in September 2021, the trial court placed Anna with her paternal aunt (Aunt). The Department had approved home studies for Aunt and one of Mother's friends, and Mother sought to have Anna placed with her friend, but the trial court decided to place Anna with Aunt. The parents were court-ordered to participate in services, including drug testing, and Mother tested positive for methamphetamine in November 2021.

In January 2022, Mother gave birth to Laura. The Department immediately filed a petition to terminate parental rights in a separate case concerning Laura, and Laura was removed from Mother at the hospital and placed with Aunt. Although Mother stayed in contact with the Department and participated in services, she again tested positive for methamphetamine in March and admitted to using methamphetamine shortly before she entered a drug rehabilitation program in April.

In June 2022, the two cases were consolidated, and the dismissal date for the case concerning Anna was extended to January 2023. The consolidated case proceeded to a jury trial in December 2022. The witnesses included Department employees, Mother, Father, Mother's therapist, Mother's friend, Aunt, and the guardian ad litem.

The evidence showed that Mother's criminal history included three felony convictions in Bell County for forgery, drug possession, and possession with intent to deliver. Mother, who was in her thirties, had been on parole, probation, or in prison since she was 18 or 19 years old except for a few months in 2013. The exhibits included orders and judgments from Bell County against Mother: a 2008 order for deferred adjudication for forgery; a 2013 judgment adjudicating guilt for forgery after Mother violated the conditions of her community supervision by, among others, testing positive for methamphetamine; a

2013 judgment for state jail felony possession of a controlled substance; and a 2014 felony conviction for possession with intent to deliver a controlled substance.

The evidence also showed that there had been domestic violence between Mother and Father, including incidents in which Mother stabbed Father and Father hit Mother with a baseball bat.[2]  Mother and Father were married, and Mother testified that they had been physically fighting with each other "a couple of years."  At the time of trial, Father faced criminal charges in Alabama based on Mother's allegation that he shot her in the leg.  In her testimony, Mother described the incident in detail.  She testified that they had been arguing during the day, that Father "whooped" her with a belt during his lunch break but then went back to work, that the argument continued in the evening, that Father "always [had] a gun on him," that he shot her while he also was holding Anna, and that she initially reported the incident differently because she was concerned about what would happen to Anna.[3]  During his testimony, Father pleaded the Fifth Amendment to questions about the shooting incident, but he testified that he and Mother engaged in domestic violence during their relationship and regularly used methamphetamine, including "several times a week" in April 2021, and that he believed they were still using methamphetamine in May 2021.

Mother testified that after she was released from the hospital following the shooting incident, she spent one night at Father's house and then traveled to Texas with Anna to

---

[2] Mother answered, "Yes," when asked, "The constants in your life—tell me if you agree with me, the constants in your life the last five years have been methamphetamine, fighting, domestic violence, and [Father]."

[3] Mother testified that if she initially had told the police that Father shot her, "they would arrest him and take [Anna] and either put her in foster care, or put her with his family, because I'm in the hospital and he's in jail."

get away from Father.[4] Father testified that she stayed "about a week" with him after being released from the hospital before traveling to Texas to check in with her parole officer. The evidence showed that Mother was required to report to her parole officer in Texas, that she and Anna stayed in Texas with her friend for around six months from the fall of 2020 to February or March of 2021, that she then went back and forth between Alabama and Texas, and that after June 2021, she and Anna lived in Texas. She was arrested on July 13 with a "blue warrant" for allegedly violating the conditions of her parole,[5] but she was released after a few weeks.

During her testimony, Mother denied the validity of the results of her positive drug tests for methamphetamine in November 2021 and March 2022 but admitted that she had used illegal drugs for most of her adult life, that she would "always have a drug problem," that she had used illegal drugs after completing a rehabilitation program in the past, and that she used methamphetamine after Anna was born. Mother admitted that she used methamphetamine with Father while on parole "[a]lmost everyday" for a "[c]ouple of months," that she told the Department that she used methamphetamine with Father in April 2021, that she used methamphetamine when she was pregnant with Laura but that she did not know she was pregnant at that time,[6] and that after completing the rehabilitation program in 2022, she had been

---

[4] Mother answered, "Yes," when asked if she had a "wake-up call" after the shooting incident and testified that she decided at the hospital that she would get Anna and leave Father.

[5] Mother testified that she was arrested under the blue warrant because she had been "out of state without permission" and "wasn't living at [her] mother's house."

[6] Mother testified about her use of methamphetamine when she was pregnant with Laura as follows:

Q.     And by the way as it turns out, when you were doing meth in late April, early May of '21, you were pregnant with [Laura], right?

sober. Mother was not employed during the case, but she was receiving disability income and assistance from friends, had moved into a one-bedroom apartment, attended school, provided some financial support for Anna and Laura, and attended supervised visits with them during the case. Mother sought to be given some form of custody over the children and raised concerns that if her parental rights were terminated and the children remained with Aunt, Mother would not be allowed to have contact with the children. Aunt initially supervised Mother's visits but after Mother tested positive for methamphetamine, the Department or a third party supervised visits, and Aunt declined to supervise further visits.

Laura and Anna remained with Aunt and her family at the time of trial. The evidence showed that Aunt and her husband had three children, that Anna and Laura were bonded with the family, and that the home was stable and appropriate. Aunt testified that she and her husband were financially able to care for their three children, Anna, and Laura. Anna was very aggressive when she started living with Aunt but was "doing much better" by trial. Aunt asked the jury to terminate Mother and Father's rights so that she and her husband could adopt Anna and Laura. She testified that if the parents' rights were terminated and it was

---

A.    I didn't know at the time, but yes.

Q.    But you were?

A.    I found out. Yes.
.
Q.    Yeah. So meth was—started flowing through her veins almost the moment she was conceived, yes?

A.    Yes.

6

appropriate to do so, she would allow contact between Mother and Father and Anna and Laura.[7] The Guardian ad litem also recommended termination so that the children could be adopted by Aunt and her husband and testified that termination was in the best interest of the children. She testified that the children were bonded to Aunt and her family in a stable home, that she did not believe that the parents could provide stability, and that Aunt "is willing to continue contact with the parents on a scheduled visitation" as long as they are acting appropriately.

The jury found that Mother had knowingly placed or knowingly allowed Anna and Laura to remain in conditions or surroundings which endangered their physical or emotional well-being, *see* Tex. Fam. Code § 161.001(b)(1)(D); that she had engaged in conduct or knowingly placed Anna and Laura with persons who engaged in conduct that endangered the physical or emotional well-being of Anna and Laura, *see id.* § 161.001(b)(1)(E); and that it was in the children's best interest to terminate her parental rights, *see id.* § 161.001(b)(2).[8] In the decree of termination, the trial court terminated Mother's parental rights on the grounds found by the jury. Mother filed a motion for new trial, which the trial court denied. This appeal followed.

---

[7] Earlier in her testimony, Aunt admitted that she had never liked Mother and answered, "Probably not, no," when asked if there was anything that Mother could do to have contact with Anna and Laura if the jury terminated the parents' rights. But Aunt later answered, "Yes," when asked:

> You were asked specifically if down the road if you adopt these girls and you have sole power over what happens with them, the relationships with whoever, if Mom after an extended period of time could show that she had made improvement and could be safe around the girls, would you let the girls have some-type of contact with her?

[8] The jury also found against Father as to the endangerment and best interest findings.

**ANALYSIS**

**Trial Court's Jurisdiction**

We begin with Mother's seventh and eighth issues because they challenge the trial court's jurisdiction.

*Anna's Home State*

In her seventh issue, Mother contends that the trial court lacked jurisdiction to make a child custody determination concerning Anna because Texas was not Anna's home state when the lawsuit was initiated. A Texas court generally has jurisdiction to make an initial child custody determination if it is the child's home state when the proceeding is commenced; a court of another state does not have jurisdiction and the child and at least one parent have "a significant connection with this state other than mere physical presence" and "substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships"; courts having jurisdiction have declined to exercise discretion; or no court of any state would have jurisdiction. *See* Tex. Fam. Code § 152.201 (stating circumstances when Texas court may make initial child custody determination). "'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." *Id.* § 152.102(7). "A period of temporary absence of a parent or a person acting as a parent is part of the period." *Id.*

Here the record supports the trial court's jurisdiction to make an initial child custody determination, even if Texas was not Anna's home state when the lawsuit was initiated.[9]

---

[9] Based on the record, the trial court alternatively could have found that: (i) Texas was the child's home state when the Department filed its petition in July 2021; or (ii) a court of another state did not have jurisdiction, that Anna and Mother had a significant connection with

"A court of this state has temporary emergency jurisdiction if the child is present in this state" and "it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." *Id.* § 152.204(a). Further, a trial court's child custody determination rendered pursuant to its temporary emergency jurisdiction permits the trial court to make a final determination if a child custody proceeding has not been and is not commenced in a state with jurisdiction, and the child's home state becomes Texas after the order is entered. *See id.* §152.204(b). Although there was an open CPS investigation in Alabama when Mother and Anna came to Texas in June 2021, the Department sought and the trial court granted emergency removal because of the risk of harm or danger to Anna, and there is no evidence in the record of any prior child custody proceeding in Alabama or that Alabama acquired jurisdiction during this case.

Because we conclude that the record supports the trial court's jurisdiction to make an initial child custody determination concerning Anna, we overrule Mother's seventh issue.

*Automatic Dismissal under Section 263.401*

In her eighth issue, Mother contends that the trial court automatically lost jurisdiction over Anna's case under section 263.401 of the Texas Family Code. Subsection 263.401(a) provides for the automatic dismissal of a suit filed by the Department requesting termination or conservatorship unless the trial court has commenced the trial on the merits or

---

Texas other than mere physical presence, and that substantial evidence was available in Texas concerning Anna. *See* Tex. Fam. Code § 152.201. Mother testified that she and Anna lived in Texas for approximately six months from the fall of 2020 to February or March of 2021; that she then started going back and forth between Alabama and Texas because of parole until June 2021; that she was required to report to her parole officer in Texas; that Grandmother lived in Texas; and that after June 2021, she and Anna lived in Texas. Mother also testified that she "had just gotten back from Texas" when the shooting incident occurred in May 2021.

9

granted an extension "on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator." *Id.* § 263.401(a). The statute allows a 180-day extension from the one-year dismissal date if the trial court finds that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b).

Mother argues that the trial court's jurisdiction automatically terminated on July 18, 2022, unless the trial court properly granted an extension. On May 20, 2022, the Department filed a motion to extend the dismissal date; on June 3, 2022, the trial court granted the motion at a hearing; and on October 26, 2022, the trial court signed an order extending the dismissal date until January 18, 2023, and setting the case for jury trial on December 5, 2022.[10] Mother has not provided this Court with a transcript from the June 2022 hearing, which occurred before the initial dismissal date; the judge's docket-sheet notes reflect that on the date of the hearing, the trial court extended Anna's case to January 2023; and the trial commenced in December 2022. *See In re G.X.H.*, 627 S.W.3d 288, 298–99 (Tex. 2021) (presuming, in absence of record from hearing on motion to extend dismissal date, that evidence was sufficient to support extension and relying on trial court's docket entry that reflected that trial court granted extension before dismissal date to conclude that trial court did not automatically lose

---

[10] In the October 2022 order, the trial court found that extraordinary circumstances necessitated that Anna remain in the Department's temporary managing conservatorship and that continuing the Department's appointment as the temporary managing conservator was in Anna's best interest.

jurisdiction). Mother contends that "*G.X.H.* was wrongly decided but recognizes that this Court is bound by the [Texas] Supreme Court precedent."

Because the record reflects that the trial court properly extended Anna's case prior to the initial dismissal date in July 2022, we conclude that the trial court's jurisdiction was not automatically lost. *See id.* We overrule Mother's eighth issue.

**Children's Removal**

In her first issue, Mother argues that the trial court violated her due process rights by removing Anna and Laura from her care and placing them with Aunt in violation of section 262.201(g) of the Texas Family Code because the Department did not make reasonable efforts to prevent or eliminate the need for removal and that the removal in violation of that section "created a significant risk of erroneous termination." *See* Tex. Fam. Code § 262.201(g) (requiring trial court following full adversary hearing to order return of child to parent unless it finds sufficient evidence of, among others, there was urgent need for protection of child that required removal and reasonable efforts were made to eliminate or prevent child's removal). Mother points to a power of attorney that she executed for her friend to take care of Anna and the Department's alleged failures to assist her with locating a domestic violence shelter, to test Laura's meconium,[11] and to obtain a court order before removing Laura. *See id.* § 262.104 (stating circumstances when Department may take possession of child without court order).

---

[11] The evidence showed that meconium is "the first stool sample of a newborn baby," that Laura's stool that was tested was not her first bowel movement but from the second day, that the test results "were not atypical of a normal result" because the stool's "color was inconsistent and/or not a normal color," and that the test results did not necessarily reflect a lack of neonatal exposure to drugs.

11

Mother also complains about the children's placement with Aunt because Aunt was allowing Father to have contact with Anna and Laura, and Aunt's husband smoked marijuana.

After a final decree has been entered, any issues concerning the trial court's temporary orders are moot and, therefore, not subject to review in an appeal from the final decree. *See In re C.M.D.*, No. 13-20-00402-CV, 2021 Tex. App. LEXIS 1133, at *9 (Tex. App.—Corpus Christi–Edinburg Feb. 11, 2021, no pet.) (mem. op.) ("Once a trial court renders a final judgment, any issue concerning its earlier removal orders becomes moot."); *In re K.E.*, No. 02-20-00045-CV, 2020 Tex. App. LEXIS 6005, at *7 (Tex. App.—Fort Worth July 30, 2020, pet. denied) (mem. op.) (holding that mother's due-process complaints about trial court's temporary orders were moot and not reaching merits of complaints); *In re E.R.W.*, 528 S.W.3d 251, 257 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("Because the trial court since has rendered a final judgment, Mother's complaints about the temporary orders authorizing emergency removal are moot."). Because a final decree has been entered, Mother's complaints about the children's removal are moot and not subject to review in this appeal.[12] Thus, we overrule Mother's first issue.

**Challenged Witness**

In her second issue, Mother argues that the trial court erred in allowing one of the Department's witnesses to testify in violation of Texas Rule of Civil Procedure 193.6 and that

---

[12] We note that "[a] parent may challenge the trial court's removal through a mandamus proceeding." *In re C.M.D.*, No. 13-20-00402-CV, 2021 Tex. App. LEXIS 1133, at *9 (Tex. App.—Corpus Christi–Edinburg Feb. 11, 2021, no pet.) (mem. op.); *see In re Steed*, No. 03-08-00235-CV, 2008 Tex. App. LEXIS 3652, at *1 n.3 (Tex. App.—Austin May 22, 2008, orig. proceeding) (mem. op.) ("Because temporary orders in a suit affecting a parent-child relationship are not subject to interlocutory appeal under the family code, mandamus review is appropriate." (citing *Dancy v. Daggett*, 815 S.W.2d 548, 549 (Tex. 1991); *In re Vernor*, 94 S.W.3d 201, 210 (Tex. App.—Austin 2002, orig. proceeding))).

her testimony probably caused the rendition of an improper judgment. *See* Tex. R. Civ. P. 193.6(a) (addressing exclusion of testimony of witness that was not timely identified); *see also id.* R. 194.4(a)(1) (addressing pretrial disclosure of witnesses); Tex. R. App. P. 44.1(a) (stating standard for reversible error). Mother argues that after the Department amended its witness list to remove the witness, Mother was "unfairly surprised," and the Department did not have good cause when it called the witness on the second day of trial; that it was the Department's burden to prove either good cause or lack of surprise; and that her attorney did not have adequate time to prepare to examine the witness.

The record, however, reflects that Mother was aware of the witness well before trial because the witness had already participated in a hearing. Mother filed a motion in limine seeking to exclude the witness's testimony on the ground that Mother's communications with the witness were privileged. During the pre-trial hearing a few days before trial on her motion in limine, Mother's attorney represented to the trial court that the witness had participated in a hearing in March and "talked all about she's an ordained minister" and that there was "a pretty good chance that something privileged [was] going to come out" because the witness was a "member of the clergy" and "a mental health worker." *See* Tex. R. Evid. 505 (addressing privilege for communications with clergy member), 510 (addressing mental health information privilege). In response, the Department's attorney advised the trial court that he did not think that he would be able to call the witness at trial because he had been unable to "get ahold of her" and so would "agree with that." Father's attorney, however, objected to the witness's exclusion during the pre-trial hearing, and the Department's attorney then stated that, if the witness shows up, he would request a hearing outside the presence of the jury. The trial court advised the parties that it would leave the issue open for trial.

13

On the second day of trial, the Department called the witness to testify, but prior to the witness testifying, the trial court held a hearing outside the presence of the jury. The Department's attorney argued that clergy communications are not privileged in proceedings regarding abuse or neglect of children. *See* Tex. Fam. Code § 261.202 (stating that evidence may not be excluded on ground of privileged communication except in case of communication between attorney and client). Mother's attorney then responded that the witness "has now become a surprise witness" because the Department had amended its witness list and taken her name off the list. Although the Department apparently removed the witness from its witness list following the pre-trial hearing,[13] the trial court reasonably could have found that Mother was not "unfairly surprised" because Father's attorney objected during pre-trial to precluding the witness from testifying, and the trial court left the issue open for trial. During the hearing outside the presence of the jury, the trial court also overruled Mother's objection to the witness that was based on privilege.[14]

Mother further complains that her attorney did not have time to prepare to examine the witness; argues that had he had more time to prepare, "he would have been able to impeach her with evidence on various issues"; and provides examples of the evidence that he would have used to impeach her had he had more time to prepare. But we may not consider evidence that was not properly included in the appellate record. *See McKinnon v. Wallin*, No. 03-17-00592-CV, 2018 Tex. App. LEXIS 6349, at *7 (Tex. App.—Austin Aug. 14, 2018,

---

[13] In its briefing to this Court, the Department represents that its attorney did not remove the witness from its list, but its attorney represented to the trial court that she was on the Department's former discovery disclosures but that he "did take her off."

[14] After the trial court overruled Mother's attorney's objection based on privilege, he asked for a running objection, which the trial court granted.

14

pet. denied) (mem. op.) (stating that appellate court may not consider documents that are not properly included in record on appeal). And Mother's attorney did not ask the trial court for more time to prepare his examination and, thus, has waived this complaint on appeal. *See* Tex. R. App. P. 33.1(a) (generally stating preservation requirements); *see also In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003) (discussing preservation rules in context of parental rights termination cases). On this record, we cannot conclude that the trial court erred when it allowed the witness to testify at trial and, thus, overrule Mother's second issue.[15]

**Jury Charge**

In her third issue, Mother contends that "[t]he trial court erred in submitting an incomplete and legally incorrect definition of 'endanger' to the jury."

*Standard of Review*

"We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review." *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (quoting *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000)). "A trial court abuses its discretion when it acts arbitrarily or unreasonably, 'without reference to any guiding rules and principles.'" *L.C. v. Texas Dep't of Family & Protective Servs.*, No. 03-14-00793-CV,

---

[15] Further, even if the trial court erred in allowing the witness to testify, we cannot conclude that the error probably caused the rendition of an improper judgment. *See* Tex. R. App. 44.1(a). The witness described herself as a "civil rights activist for parents when they are involved in CPS cases" and testified about services that she provided to Mother between January and March 2021, a GoFundMe page seeking funding for Mother, and video postings on TikTok of Mother, but some of this information came in through other testimony without objection, and the witness's testimony was short and peripheral. *See In re G.H.*, No. 02-14-00310-CV, 2015 Tex. App. LEXIS 2594, at *19 (Tex. App.—Fort Worth Mar. 19, 2015, no pet.) (mem. op.) (concluding that admission of exhibits was harmless when some of information came in through testimony or other exhibit without objection and appellate court concluded that evidence was sufficient to support termination without relying on objected-to exhibits).

2015 Tex. App. LEXIS 5770, at *19 (Tex. App.—Austin June 8, 2015, pet. denied) (mem. op.)

(quoting *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011); *Downer v. Aquamarine Operators, Inc.*,

701 S.W.2d 238, 241–42 (Tex. 1985)); *see also Thota*, 366 S.W.3d at 687 (stating that "trial

court has considerable discretion to determine proper jury instructions"). "The omission of an

instruction is reversible error only if the omission probably caused the rendition of an improper

judgment." *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *see* Tex. R. App. P. 44.1(a).

*Instruction Defining "Endanger"*

The jury charge included the following instruction defining "endanger":

To "endanger" means to expose to loss or injury, to jeopardize. It is not necessary that the conduct be directed at the child or that the child actually suffers injury. This means that the conduct of the parent, or the conditions or surroundings in which the children lived, exposed the children to loss or injury or jeopardized the emotional or physical health of the children. The parental course of conduct includes both the parent's actions and the parent's omissions or failures to act. Acts by the parents both before and after the child's birth may be considered. The conduct of the parent did not have to be directed at the child; nor must the child actually have suffered injury from the parent[']s conduct. The specific danger to the well-being of the children need not be established as an independent proposition, but may be inferred from the parent's misconduct alone.

Mother objected to the instruction as "incomplete" and requested that the following two

sentences be inserted after the third sentence in the above definition:

It means more than a threat of metaphysical injury with the possible ill-effects of a less than ideal family environment. Living conditions that are merely less than ideal do not support a finding of endangerment.

The trial court overruled Mother's objection to the instruction and denied Mother's request to

insert the additional language into the instruction.

16

On appeal, Mother cites *Texas Department of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), as support for her position that the trial court abused its discretion when it denied her requested instruction. In that case, the Texas Supreme Court stated, "While we agree that 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* That Mother's proposed sentences are legally correct statements of the law, however, does not establish that the trial court abused its discretion when it did not include the sentences in its instructions to the jury.

Faced with a parent's analogous request to add similar language to a jury instruction defining "endanger," this Court concluded that the parent failed to show that the trial court abused its discretion when it denied the parent's request. *See B.S. v. Texas Dep't of Family & Protective Servs.*, No. 03-22-00279-CV, 2022 Tex. App. LEXIS 8324, at *9–11 (Tex. App.—Austin Nov. 10, 2022, no pet.) (mem. op.). This Court explained that the parent "failed to demonstrate that failing to use his preferred language for that specific sentence fails to accurately state the law so as to render the definition legally incorrect and improper" and that the parent "[had] not demonstrated how his requested instruction was necessary to enable the jury to render a proper verdict when considering the definition as a whole that was submitted to the jury." *See id.* at *11; *see also In re K.H.*, No. 12-05-00077-CV, 2006 Tex. App. LEXIS 9661, at *7–8 (Tex. App.—Tyler Nov. 8, 2006, no pet.) (mem. op.) (rejecting similar challenge to "endanger" definition because court could not conclude that requested definition was necessary for jury to render proper verdict). Applying this Court's analysis in *B.S.*, we cannot conclude that the trial court abused its discretion in instructing the jury on the meaning of endanger and overrule Mother's third issue.

17

**Sufficiency of the Evidence**

In her fourth and fifth issues, Mother challenges the legal and factual sufficiency of the evidence to support the jury's endangerment and best interest findings.

*Standard of Review*

To terminate parental rights under section 161.001, the Department has the burden to prove by clear and convincing evidence one of the predicate grounds in subsection (b)(1) and that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* Tex. Fam. Code § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases"). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *see In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (stating definition of "clear-and-convincing burden of proof" that court adopted (citing *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979))).

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Legal sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* In reviewing the factual sufficiency of the evidence under the clear-and-

convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We must give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108–09 (Tex. 2006); *see In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that when reviewing termination order, appellate courts defer to "factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

*Endangerment Findings*

Mother challenges the legal and factual sufficiency of the evidence to support the jury's predicate findings under subsections (D) and (E)—that (i) Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being, and (ii) Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis in appeal challenging subsection (D) or (E) finding because of "due process concerns, coupled with the requirement for a meaningful appeal").

As the trial court instructed the jury, "'[e]ndanger' means 'to expose to loss or injury; to jeopardize.'"  *Boyd*, 727 S.W.2d at 533).  "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone." *Pruitt v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at \*13–14 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "It is not necessary that the conduct be directed at the child or that the child actually suffer physical or emotional injury," the conduct does not have to occur in the presence of the child, and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department."  *Id.*  "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.* at \*14.

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied.).  "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent."  *Id.*  In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being.  *V.P. v. Texas Dep't of Family & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at \*9–10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.).  "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home—including physical violence or abusive conduct by one parent toward the other parent—is part of the 'conditions or surroundings' of the child's home under subsection (D)."  *Id.* at \*10 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort

20

Worth 2009, no pet.)). Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See id.* at \*11 (citing *In re M.R.J.M.*, 280 S.W.3d at 503).

In this case, the evidence showed that the parents used methamphetamine throughout their relationship and engaged in domestic violence. *See id.* at \*9–10. Mother admitted that she and Father engaged in domestic violence and that Anna was present during the 2021 shooting incident. *See In re M.R.*, 243 S.W.3d 807, 818–19 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of exposing child to domestic violence supported endangerment findings). Father also testified that they regularly used methamphetamine during their relationship, including "several times a week" in April 2021, and that he believed they were still doing methamphetamine in May 2021. *See In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.— Dallas 2019, pet. denied) ("Evidence of a parent's drug use, or evidence that another parent allowed a child to be around a parent or other persons using drugs, can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D) and can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being under subsection (E).").

The evidence also showed that Mother used methamphetamine while the termination proceedings were pending against her and when she was pregnant with Laura. *See id.* ("Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E)."); *see also In re I.R.Z.*, No. 14-22-00431-CV, 2022 Tex. App. LEXIS 9004, at \*13–14, 18–19 (Tex. App.—Houston [14th Dist.] Dec. 8, 2022, pet. denied) (mem. op.) (concluding that Mother's drug abuse during pregnancy was endangering conduct under subsections (E) and supported

21

reasonable inference that Mother exposed child to endangering condition or surrounding while child in utero); *J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00274-CV, 2021 Tex. App. LEXIS 9127, at *15–17 (Tex. App.—Austin Nov. 10, 2021, pet. denied) (mem. op.) (considering Mother's drug use during pregnancy as supporting endangerment finding). Mother, who was in her thirties, had been on parole, probation, or in prison since she was 18 or 19 years old except for a few months in 2013. *See In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) ("[I]ntentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child."); *see also In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021) (stating that parent's criminal history can support finding of endangerment).

Mother argues that the evidence showed that she "fled from domestic violence in an effort to protect [the children]" and that she "entered rehab and obtained lasting sobriety after two positive tests in the first 10 months of the case." Although Mother also testified that she "did not do any meth while [she] was pregnant with [Laura]," the evidence supported that Mother knew that she was pregnant with Laura when she was using methamphetamine. She tested positive for methamphetamine in November 2021, and Laura was born a few months later. Father also testified that he and Mother were using methamphetamine several times a week in April, and he thought they also used in May 2021 when Mother was pregnant with Laura and they were taking care of Anna. Moreover, Mother allowed Father to care for Anna while she was in the hospital from her gunshot wound and then stayed with him for at least one night after she was discharged from the hospital. Mother also tested positive for methamphetamine in March 2022 and admitted to using methamphetamine in April 2022. *See J.B. v. Texas Dep't of Family & Protective Servs.*, No. 03-21-00325-CV, 2021 Tex. App. LEXIS 9308, at *18–19 (Tex.

22

App.—Austin Nov. 17, 2021, pet. denied) (mem. op.) (considering ongoing drug use after child was removed as evidence of endangering course of conduct); *see also In re C.V.L.*, 591 S.W.3d at 751. Although Mother denied that she had used methamphetamine in November 2021 and March 2022 and challenged the validity of the test results, the jury reasonably could have resolved the conflicting evidence against Mother and found her testimony not credible. *See In re A.B.*, 437 S.W.3d at 503; *J.B.*, 2021 Tex. App. LEXIS 9308, at \*18–19.

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the endangerment findings against Mother. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d at 232–33; *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule her fourth issue.

*Best Interest*

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is

controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d at 27–28; *Pruitt*, 2010 Tex. App. LEXIS 10272, at \*22–23.

Mother argues that "[t]hree factors weighed heavily against termination": (i) the Department's plan to place the children with Aunt because she was the sister of Father, "guaranteeing that [Anna and Laura] will be exposed to him for the rest of their lives"; (ii) Mother "acknowledged that her past was not ideal and made significant strides to improving herself for [Anna and Laura]"; and (iii) the evidence showed that Anna and Laura loved Mother. In reaching its best-interest findings, however, the jury could have disbelieved Mother's testimony to the extent it supported that she could provide the children with a safe home. *See In re A.B.*, 437 S.W.3d at 503 (stating that appellate courts defer to factfinder's assessment of witnesses' credibility). The jury reasonably could have found significant the testimony and other evidence of Mother's endangering conduct when she was pregnant with Laura and taking care of Anna and her endangering conduct during the termination proceeding to reasonably infer that this conduct was likely to recur. *See Holley*, 544 S.W.2d at 371–72 (listing among factors acts or omissions by parent showing parent-child relationship was not proper); *J.A. v. Texas Dep't of Family & Protective Servs.*, No. 03-18-00203-CV, 2018 Tex. App. LEXIS 5410, at \*7 (Tex. App.—Austin July 18, 2018, no pet.) (mem. op.) (stating in context of best-interest analysis that factfinder "could reasonably have formed a firm conviction that evidence of [parent's] recent 'turnaround' is not a guarantee that her drug problems will not recur and was not required to ignore her long history of dependency"); *In re E.A.*, No. 13-06-00503-CV, 2007 Tex. App. LEXIS 7159, at \*25 (Tex. App.—Corpus Christi–Edinburgh Aug. 31, 2007, no pet.) (mem. op.) ("Because there is evidence that appellant's past actions were unsuitable, the trial court could

have inferred that similar unsuitable conduct could recur in the future if the children are returned to appellant."); *see also Pruitt*, 2010 Tex. App. LEXIS 10272, at \*22–23.

Witnesses testified about their concern for Anna and Laura if they were returned to Mother and their beliefs that the children should remain with Aunt and her family. *See Holley*, 544 S.W.2d at 371–72 (listing among factors parental abilities and needs and danger to children in future). Mother's former therapist testified that Mother was "a very aggressive, dangerous person" who did not follow rules, that she was a danger to her children, and that the children would not be safe with her. The guardian ad litem testified that termination of parental rights was in the children's best interest and provided the underlying bases for her beliefs, including that termination would allow the children to be adopted by Aunt who was providing them with a stable home and "willing to continue contact with the parents" if appropriate. The guardian ad litem also did not believe that either parent could provide the children with stability, and the evidence showed that the children were thriving in their current placement. Aunt and her family were providing the love and stability that the children needed; Aunt and her husband hoped to adopt the children; and if parental rights were terminated, Aunt would only allow continued contact between the parents and the children if appropriate. *See id.* (listing among factors plans for children by individual or agency seeking custody). Although Aunt testified that her relationship with Mother had soured after the problems between Mother and Father started, she also testified that she was willing to allow contact between Mom and the children if it was safe to do so.

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the jury's best-interest findings against Mother.

*See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule Mother's fifth issue.

**Motion for New Trial**

In her sixth issue, Mother contends that the trial court abused its discretion in denying her motion for new trial that was based on "newly discovered" evidence. A party seeking a new trial on grounds of newly-discovered evidence must show to the trial court that (1) "the evidence has come to its knowledge since the trial," (2) "its failure to discover the evidence sooner was not due to lack of diligence," (3) "the evidence is not cumulative," and (4) "the evidence is so material it would probably produce a different result if a new trial were granted." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). Denial of a motion for new trial is reviewed for abuse of discretion. *Id.*

Mother sought a new trial based on the results of her most recent hair follicle test that "was clean." Mother contends that her attorney discovered the evidence after trial, that its late discovery was not due to lack of diligence, and that the evidence was "not merely cumulative but supported her testimony that she had been sober and drug free for eight months and that the evidence was material because a primary theme of the Department's case was that Mother "had a long history of methamphetamine use and that her testimony that she was [eight] months sober could not be believed."

On this record, we cannot conclude that the trial court abused its discretion by denying Mother's motion for new trial. The trial court reasonably could have concluded that the evidence from the drug test was not so material that it probably would produce a different result if a new trial were granted. Although the test results were negative for methamphetamine, they

26

were actually "positive until further verification of prescription" for opiates, codeine and hydrocodone. Mother contends that she had a prescription, but she did not attach proof of a prescription to her motion. Further, even if she had presented evidence of a prescription, the trial court reasonably could have concluded that the evidence of the drug test was cumulative of other evidence. Mother testified that she had remained sober, and the evidence included the hair follicle test results from August 2022 that were negative. Finally, the trial court reasonably could have concluded that Mother failed to show that her late discovery of the test results was not due to a lack of diligence. We overrule Mother's sixth issue.

**Consolidation of Cases**

In her ninth issue, Mother contends that the trial court erred in consolidating Anna's and Laura's cases. At the same hearing in June 2022 that the trial court considered and granted the Department's motion to extend Anna's case, the trial court considered and granted its motion to consolidate the two cases.

"A trial court has broad discretion to consolidate cases 'that relate to substantially the same transaction, occurrence, subject matter, or question' such that the evidence 'will be material, relevant, and admissible in each case.'" *B.D. v. Texas Dep't of Family & Protective Servs.*, No. 03-20-00118-CV, 2020 Tex. App. LEXIS 6980, at *36–37 (Tex. App.—Austin Aug. 28, 2020, pet. denied) (mem. op.) (quoting *In re Gulf Coast Bus. Dev. Corp.*, 247 S.W.3d 787, 794 (Tex. App.—Dallas 2008, orig. proceeding)); *see* Tex. R. Civ. P. 174(a). "The purpose of consolidation is 'to further convenience, to avoid prejudice, and to promote the ends of justice,' but '[t]he rights of the parties to a fair trial cannot be compromised in the name of judicial economy,' and a trial court 'has no discretion to deny separate trials when an injustice will

27

result.'" *B.D.*, 2020 Tex. App. LEXIS 6980, at *37 (quoting *In re Ethyl Corp.*, 975 S.W.2d 606, 610 (Tex. 1998) (orig. proceeding)). "The trial court should balance judicial economy and convenience against 'the risk of an unfair outcome because of prejudice or jury confusion' and should not consolidate if it will prejudice the complaining party." *Id.* (quoting *Gulf Coast*, 247 S.W.3d at 794–95).

Mother argues that the cases should not have been consolidated because they involved different children, different facts "prompting the removal of each," and "significantly different jurisdictional timelines," and that the consolidation prejudiced Mother. Mother, however, has not provided a transcript from the June 2022 hearing or cited to the record where she raised this complaint with the trial court and, thus, has not preserved it for appellate review. *See* Tex. R. App. P. 33.1(a) (addressing preservation of appellate complaints). Further, even if she had preserved this complaint, Mother has failed to demonstrate actual prejudice from the consolidation, and we may not presume it. *See B.D.*, 2020 Tex. App. LEXIS 6980, at *37 (explaining that appellate court may not presume prejudice and that "appealing party must demonstrate actual prejudice"). The evidence including Mother's endangering conduct and the children's placement with Aunt was relevant and admissible as to both children. *See Pruitt*, 2010 Tex. App. LEXIS 10272, at *13–14 (stating that courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department"). We overrule Mother's ninth issue.

**CONCLUSION**

Having overruled Mother's issues, we affirm the trial court's decree of termination.

28

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed:   June 13, 2023